Receipt number AUSFCC-11309945

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| DR. CAMILLE KAMGA,<br><br>*Plaintiff*,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant*. | Case No.: 26-870 C |

**COMPLAINT**

1. Almost four decades ago, Congress created the University Transportation Center (UTC) Program to fund cutting-edge transportation research at institutions of higher education. Since then, Congress has reauthorized the UTC Program numerous times. Each time, the United States Department of Transportation (DOT) selected colleges and universities to serve as UTCs, according to criteria and priorities prescribed by Congress. And each UTC was awarded a grant to fulfill its duties as a UTC.

2. Congress authorized the current iteration of the UTC Program in 2022, providing more than $80 million to fund five national UTCs, ten regional UTCs, and twenty Tier 1 UTCs. Through an open and competitive application process, DOT chose the Center for Social and Economic Mobility for People And Communities through Transportation (SEMPACT) to serve as the UTC for Region 2, an area that covers New York, New Jersey, Puerto Rico, and the U.S. Virgin Islands. SEMPACT, a consortium of colleges and universities led by City College of New York (CCNY), was awarded a total of $15 million to fund its operations as the Region 2 UTC—$3

million per year over a five-year grant term.[1] The SEMPACT grant agreement identified Plaintiff Dr. Camille Kamga as the Center Director.

3. As Center Director, Dr. Kamga worked diligently to satisfy all obligations imposed by the grant agreement. And SEMPACT researchers, including Dr. Kamga, made significant progress on the research and other projects outlined in the agreement's statement of work during the first two years of the grant term. Before President Trump took office, DOT agreed that SEMPACT satisfied the terms of the agreement.

4. But on May 2, 2025, DOT terminated the SEMPACT grant agreement. SEMPACT's research was suddenly and without evidence deemed too "woke" and "counter to the transportation priorities of the American people."[2] Relying on an erroneous interpretation of its authority to terminate the grant agreement and a blatant mischaracterization of SEMPACT's work, DOT's actions breached both the SEMPACT grant agreement and its implied duty of good faith and fair dealing.

5. For these reasons, Dr. Kamga is entitled to recover money damages for breach of the SEMPACT grant agreement caused by DOT's illegal actions.

## STATEMENT OF JURISDICTION

6. Jurisdiction in this case is proper in this Court under 28 U.S.C. § 1491(a)(1) ("Tucker Act").[3] Monetary relief is also available under the Tucker Act.

---

[1] The grant recipient named in the agreement is "Research Foundation of City University of New York -- City College" (RFCUNY), a not-for-profit educational corporation. RFCUNY provides post-award fiscal and administrative support for CUNY research programs, like SEMPACT. But RFCUNY does not play a role in the day-to-day activities at SEMPACT.

[2] Press Release, U.S. Dep't of Transp., U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants (May 2, 2025), https://perma.cc/QT9H-E2N8.

[3] Dr. Kamga files this action to obtain money damages for DOT's termination of the SEMPACT grant and does not waive any rights he or any other party may have to challenge any related agency action in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring).

## PARTIES

7. Plaintiff is Dr. Camille Kamga, the Director for the University Transportation Research Center (UTRC) at the CUNY City College of New York, where SEMPACT is housed, and a Professor of Civil Engineering at The City College of New York.

8. Defendant is the United States of America, acting through the Department of Transportation (DOT), a cabinet-level agency within the Executive Branch, and Secretary of Transportation Sean Duffy, the highest-level official in DOT.

## FACTUAL BACKGROUND

### I. The University Transportation Center Program

9. Congress created the University Transportation Center (UTC) Program in 1988, originally funding ten regional transportation centers at nonprofit institutions of higher learning. Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 314, 101 Stat. 132, 230–32. According to the statute, the regional centers' primary purpose would be conducting transportation-related research. *Id.*

10. Over the next several decades, Congress reauthorized and expanded the scope of the UTC Program.[4] The Intermodal Surface Transportation Equity Act (ISTEA) of 1991, for example, added educational programming and technology transfer as objectives of the UTC Program, in addition to the program's ongoing commitment to transportation research. Pub. L. No. 102-240, § 6004, 105 Stat. 1914, 2169 (1991) (education); Pub. L. No. 102-240, § 6001 (technology transfer).[5] Through the ISTEA and subsequent reauthorizations, Congress also directed the creation of certain centers to achieve more specific purposes, including, for example,

---

[4] *Program History*, U.S. Dep't of Transp. (last updated Apr. 15, 2025), https://perma.cc/QM4H-2GLL.

[5] *Id.*

"[t]o accelerate the involvement and participation of minority individuals and women in transportation-related professions." Pub. L. No. 102-240, § 6023. In 2015, Congress instructed the Secretary to award grants that "further[]" six statutory research priorities: "(A) improving mobility of people and goods; (B) reducing congestion; (C) promoting safety; (D) improving the durability and extending the life of transportation infrastructure; (E) preserving the environment; and (F) preserving the existing transportation system." Fixing America's Surface Transportation (FAST) Act, Pub. L. No. 114-94, § 6053, 129 Stat. 1312, 1580 (2015).

11. Most recently, in 2021, Congress reauthorized the UTC Program with the Infrastructure Investment and Jobs Act (IIJA) and added an additional statutory research priority of "reducing transportation cybersecurity risks." 49 U.S.C. § 6503(c)(1)(G). The IIJA also directed the Secretary to establish "nonexclusive candidate topic areas" within each of the statutory research priorities, and to then award grants in these established topic areas. 49 U.S.C. § 5505(b)(4)(A); *see* 49 U.S.C. § 6503(c)(1).

12. The IIJA authorized more than $80 million for each fiscal year from 2022 through 2026 to fund five national, ten regional, and twenty Tier 1 centers, Pub. L. No. 117-58, § 11101, 135 Stat. 429, 447 (2021), and provided that each grant to the regional centers should be between $1.5 million and $3 million a year for the duration of the program, 49 U.S.C. § 5505(c)(3)(C).

## II. The SEMPACT Grant

### *A. DOT Publishes 2022 Notice of Funding Opportunity and SEMPACT Applies*

13. To implement the UTC Program as set forth in the IIJA, DOT announced a new grant competition in May 2022. DOT published a corresponding Notice of Funding Opportunity (NOFO), which is the agency's "formal announcement" of an available award that "provides information on the award, such as who is eligible to apply, the evaluation criteria for selecting a recipient or subrecipient, the required components of an application, and how to submit the

application." 2 CFR § 200.1. This time around, the UTC Program "both sustain[ed] existing and establishe[d] new and vital initiatives in transformational research, education and workforce development, and technology transfer that benefit the U.S. traveling public, freight movement, and the safety and efficiency of the U.S. transportation system, while addressing . . . issues of transportation accessibility and equity."[6]

14. The NOFO provided that regional UTCs must obtain matching funds from non-federal sources in an amount equal to the DOT award and that DOT would select ten regional UTCs to receive awards of up to $3 million each for fiscal years 2022 through 2026.[7]

15. Regional UTCs were required to "focus their efforts"—and therefore, necessarily, their grant applications—on "one or more of the seven statutory research priority areas: Improving Mobility of People and Goods; Reducing Congestion; Promoting Safety; Improving the Durability and Extending the Life of Transportation Infrastructure; Preserving the Environment; Preserving the Existing Transportation System; and Reducing Transportation Cybersecurity Risks"—while also "address[ing] what the Regional UTC identifies as regional needs."[8] The NOFO identified "[t]ransportation [e]quity" as one of DOT's "candidate topic areas" within the "Improving Mobility of People and Goods" research priority.[9] *See supra* ¶ 11. Applicants were also to be assessed on how their proposals supported DOT's "Strategic Plan Goals" for fiscal years 2022 through 2026.[10] Like the NOFO, the Strategic Plan included "equity" as a strategic goal.[11] Finally,

---

[6] U.S. Dep't of Transp., Notice of Funding Opportunity for the Univ. Transp. Ctrs. Program 7 (May 2022), https://www.transportation.gov/sites/dot.gov/files/2022-05/UTC%20NOFO%202022.pdf.
[7] *Id.* at 10–14.
[8] *Id.* at 11 (citing and quoting 49 U.S.C. § 6503(c)(1)).
[9] *Id.* at 21.
[10] *Id.* at 23.
[11] U.S. Dep't of Transp., *Strategic Plan FY 2022–2026*, at IV, 19–23 (Jan. 2023), https://www.transportation.gov/sites/dot.gov/files/2025-

the NOFO encouraged applicants to consider how their grant proposals would advance other DOT efforts, including DOT's plans "to expand access and opportunity to all communities while focusing on underserved, overburdened, and disadvantaged communities" and the Executive Order titled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."[12]

16. SEMPACT applied to serve as the regional UTC for Region 2, which covers New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands. Consistent with both the statute and the NOFO, SEMPACT centered its proposed research around the statutory research priority of "[i]mproving mobility of people and goods." And as encouraged by the NOFO, SEMPACT's application also described how SEMPACT's efforts would support the goals set forth in DOT's Strategic Plan, including equity. The projects proposed in the application included a comprehensive report on transportation challenges in the region, as well topical research projects including retrofitting highway bridges to prevent collapse, improving freight supply chains to support increased e-commerce trade, and designing and retrofitting transportation infrastructure to withstand potential impacts from major events such as Hurricane Sandy, which devastated the transportation infrastructure in the region. These projects were to be spearheaded by researchers, including Dr. Kamga, with decades of experience leading cutting-edge transportation research.

17. The application named Dr. Kamga as the Center Director, akin to the "Chief Executive Officer" of SEMPACT. In this role, Dr. Kamga would be "responsible for implementing the Center's programs and ensuring compliance with all other UTC Program requirements." Specifically, he would have "overall Center responsibility, including the conduct of all programs,

---

01/U.S.%20Department%20of%20Transportation%20Strategic%20Plan%20FY%202022-2026.pdf.

[12] UTC May 2022 NOFO, *supra* note 6, at 8.

development of new initiatives and public presentation of SEMPACT business and accomplishments," and would "serve as liaison with USDOT, sponsors and other groups."

***B. DOT Awards Grant to SEMPACT***

18. Following a full and open competition for the grant awards, SEMPACT was designated as the Region 2 UTC and awarded a grant totaling $15 million to be disbursed in annual increments over the following five years. DOT publicly announced the award selections and UTC designations—including SEMPACT's designation as the Region 2 UTC—on February 21, 2023.[13]

19. The initial grant agreement—effective June 1, 2023—awarded SEMPACT its first installment of $3 million. The agreement made clear that DOT "expects to award four additional increments of funding . . . at approximately annual intervals from, and in amounts similar to, this initial award." These remaining funds would be effectuated as "Modifications to this Grant Agreement" and would be subject only to "availability of funds and to the Grant Recipient's compliance with deliverables due to date." Per the terms of the grant, SEMPACT would access these funds by submitting reimbursement requests,[14] and costs could be incurred until the grant's termination date of May 31, 2029.

20. The grant agreement incorporated SEMPACT's application by reference into the agreement as its statement of work, explaining that "[t]he [a]pplication . . . submitted for this [g]rant . . . serves as a general description of work to be done under the [g]rant" and requiring

---

[13] 2022 Bipartisan Infrastructure Law University Transportation Centers Program Competition, U.S. Dep't of Transp. (Feb. 21, 2023), https://perma.cc/KWE2-VQK5; Infrastructure Investment and Jobs Act (IIJA) Centers and Grantees, U.S. Dep't of Transp. (archived Apr. 18, 2025), https://web.archive.org/web/20250418124541/https://www.transportation.gov/utc/iija-centers-and-grantees#Regional. SEMPACT has since been removed from this list. *See* Infrastructure Investment and Jobs Act (IIJA) Centers and Grantees, U.S. Dep't of Transp., https://perma.cc/4W3S-BUQQ (last visited June 12, 2026).

[14] U.S. Dep't of Transp., Univ. Transp. Ctrs. Program: General Provisions of Grants 12 (June 2023), https://www.transportation.gov/sites/dot.gov/files/2023-06/UTC%20General%20Provisions%20of%20Grants%20FINAL%20June%202023.pdf.

SEMPACT to notify the grant manager "if circumstances arise that will significantly affect [SEMPACT's] ability to fulfill the intent of its [a]pplication." The SEMPACT grant agreement also incorporated by reference and made part of the agreement two other documents: (1) Grant Deliverables and Reporting Requirements for 2023 University Transportation Centers, dated June 2023;[15] and (2) General Provisions of Grants for 2023 University Transportation Centers, dated June 2023.[16]

21. The grant agreement imposed myriad obligations on SEMPACT and, specifically, on Dr. Kamga as the Center Director. In fact, the grant agreement emphasized his "meaningful direct involvement in the Center's operations" and noted that DOT's "decision to award a UTC Grant . . . is based to a considerable extent upon its evaluation of the proposed Center Director's knowledge of the field of study and his/her capabilities to lead a UTC."[17]

22. Once the grant was awarded, Dr. Kamga was in ongoing, direct communication with DOT grant management staff. For example, the grant agreement contemplates an "initial information meeting" between the "Grant Manager" and the "Grant Recipient" for the purpose of "establishing working relationships"; "ensuring that . . . the Grant Recipient understands the reporting and other requirements; and conveying to the Grant Recipient best practices for operating a University Transportation Center grant." Mr. Caesar Singh, then DOT's University Grants Programs director, contacted Dr. Kamga and the other Center Directors frequently about the grant, including about required meetings between DOT and Center Directors.

[15] U.S. Dep't of Transp., Univ. Transp. Ctrs. Program: Grant Deliverables and Reporting Requirements (June 2023), https://www.transportation.gov/sites/dot.gov/files/2023-06/UTC%20Grant%20Deliverables%20and%20Reporting%20Requirements%20FINAL%20June%202023.pdf.

[16] UTC General Provisions, *supra* note 14.

[17] UTC General Provisions, *supra* note 14, at 9.

23. The agreement also defined the parameters for terminating the grant. The Grant Deliverables and Reporting Requirements, as incorporated into the grant agreement, contemplated termination of a grant only "[i]n extreme cases of non-compliance" with mandatory grant deliverables and reporting requirements.[18]

24. The General Provisions of Grants for 2023 University Transportation Centers, as incorporated into the grant agreement, noted that the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200), known as the OMB's Uniform Grant Guidance, would apply to UTC grants.[19]

25. OMB's Uniform Grant Guidance identifies several possible grounds on which an agency can terminate a federal grant, including "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).[20] But this termination ground was not specifically incorporated into the SEMPACT grant agreement.

26. By its plain language, 2 C.F.R. § 200.340(b) requires an agency to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," including which provisions of § 200.340(a) apply to a particular award, by setting out the specific bases for termination in the agreement itself. In October 2024, OMB even revised 2 C.F.R. § 200.340 to "provide[] greater clarity on the policy for termination of awards . . . by underscoring the need . . . to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,089

[18] UTC Grant Deliverables, *supra* note 15, at 4.
[19] UTC General Provisions, *supra* note 14, at 5.
[20] Prior to October 1, 2024, this paragraph of the regulation appeared as paragraph (a)(2) with minor textual differences.

(April 22, 2024). As such, inclusion of the agency priorities termination provision is a prerequisite to termination on that basis. *Id.* This requirement is reinforced by the complementary regulatory obligation that an agency "must inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the Federal award" in the grant agreement itself. 2 C.F.R. § 200.211(c)(1)(v).

27. Neither the grant agreement nor any of the incorporated documents specified that the award could be terminated if the agency made a determination that the grant no longer effectuated agency goals or priorities.

### *C. SEMPACT Satisfies Ongoing Grant Requirements*

28. As the UTC for Region 2, SEMPACT carried out its work as promised in its application. Per the statutory priorities, much of its research focused on improving the resilience of critical transportation infrastructure, which supports safer travel, more reliable commerce, and reduced risks to local communities and the broader economy. For example, one research team set out to modernize the risk assessments used to protect bridge piers from large ship impacts, helping prevent catastrophic bridge collapses like the Francis Scott Key Bridge disaster.[21] Another team evaluated alternative technologies to protect bridges from overheight vehicle collisions, seeking to lessen the resulting structural damage, traffic disruptions, and costly repairs.[22]

29. The grant also funded multiple projects seeking to quantify the "persistent and escalating challenge" of flooding in urban areas "due to its widespread and adverse impacts on

---

[21] *Collapse of Francis Key Bridge: Protection of Bridge Piers from Large Ship Impacts*, University Transportation Research Center, https://utrc2.org/research/projects/collapse-francis-key-bridge-protection-bridge-piers-large-ship-impacts (last visited June 12, 2026).

[22] *Protection Technologies for Bridges Against Overheight Impacts*, University Transportation Research Center, https://utrc2.org/research/projects/protection-technologies-bridges-against-overheight-impacts (last visited June 12, 2026).

transportation and the normal functioning of the economy."[23] Specifically, the research focused on developing models to better predict urban stormwater flooding. These improved predictions would, in turn, enable urban planners, emergency responders, and transportation agencies to implement more effective flood preparedness and response initiatives, thereby mitigating the health, safety, and economic impacts of flooding across Region 2 and beyond.

30. Another grant-funded project sought to develop a roadmap for small- and medium-sized transit agencies using artificial intelligence. The project hoped to enable transit agencies to better coordinate and leverage a range of AI capabilities, from "predictive maintenance and demand forecasting to autonomous vehicle operations and real-time passenger information systems."[24]

31. As required by statute, the grant also supported various STEM education and workforce development programs, such as an Automotive Technology job readiness program that prepares graduates for entry-level automotive industry positions—ranging from diagnostician to equipment sales and service to dealership service manager—without first attending college.[25]

---

[23] *Enhancing and Validating Models for Predicting Urban Stormwater Flooding*, University Transportation Research Center, https://utrc2.org/research/projects/enhancing-and-validating-models-predicting-urban-stormwater-flooding (last visited June 12, 2026); *Predicting Urban Stormwater Flooding Using Geomorphic Information*, University Transportation Research Center, https://utrc2.org/research/projects/predicting-urban-stormwater-flooding-using-geomorphic-information (last visited June 12, 2026); New Jersey Inst. of Tech., Final Report: Predicting Urban Stormwater Flooding Using Geomorphic Information, SEMPACT (Aug. 31, 2024), https://utrc2.org/sites/default/files/applications/SEMPACT_FinalReport_Yr1_NJIT_Boufadel_StormWater.pdf.

[24] Roadmap of AI Developments for Small and Medium Size Transit Agencies, University Transportation Research Center, https://utrc2.org/research/projects/roadmap-ai-developments-small-and-medium-size-transit-agencies (last visited June 12, 2026).

[25] Career Trainings (Workforce Development), SEMPACT, https://utrc2.org/sempact#WorkforceDevelopment (last visited June 12, 2026).

32. Across SEMPACT, the grant funded critical research projects of approximately 25 faculty members and principal investigators and 35 graduate and undergraduate researchers, and enabled collaboration between multiple local agencies and university partners.

33. In compliance with the grant terms, SEMPACT published semi-annual reports on the prior period's grant-funded activities, including its research progress and plans to further the grant priorities during the next reporting period.[26]

34. SEMPACT received its second installment of funds under the grant agreement in 2024.[27] Like the initial agreement, the grant modification awarding these funds indicated that DOT "expects to award three additional increments of funding . . . at approximately annual intervals from, and in amounts similar to, this award," and restated the May 31, 2029 deadline for costs incurred under the SEMPACT grant. No other grant terms were altered.

35. Per the established expectation of continued funding, Mr. Singh (now DOT's Director of University Research, Technology & Education) emailed Dr. Kamga and the other Center Directors on January 16, 2025, instructing them to request the third installment of funds. The email made clear that DOT intended to pay this upcoming installment, stating that "[t]his additional funding will be awarded to your university as a modification to your grant . . . , keeping the same 5/31/2029 termination date." The award was only "contingent upon your submission of all reporting requirements due before the date of release," with which Dr. Kamga complied.

## III. The Trump Administration's Crusade Against Academic Freedom

36. Leading up to his election in November 2024, President Trump promised to curtail free speech on campuses. He pledged to "reclaim our once great educational institutions from the

[26] USDOT Semi-Annual Reports, SEMPACT, https://utrc2.org/sempact#ProgressReports (last visited June 12, 2026).

[27] The full amount of the installment, $3 million, for this year was not available due to DOT funding constraints. Accordingly, the second installment was $2,947,770.

radical Left and Marxist maniacs"[28] and declared that "there will be no wokeness . . . allowed."[29] He has followed through on these threats.

37. On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," which defined "'diversity, equity, and inclusion' (DEI)" initiatives as "illegal and immoral discrimination programs."[30] Accordingly, EO directed each agency head, in concert with OMB, OPM, and the Attorney General, to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts."[31]

38. The next day, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," proclaiming that "'diversity, equity, and inclusion' (DEI)," and "'diversity, equity, inclusion, and accessibility' (DEIA)" policies are "dangerous, demeaning, and immoral."[32] This EO requires agency heads to forbid recipients of federal grants and contracts from operating "programs promoting DEI that violate any applicable Federal anti-discrimination laws."[33] It further directed OMB and the Attorney General to "[t]erminate all 'diversity,' 'equity,' . . . 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities."[34]

---

[28] *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions* (July 17, 2023), https://web.archive.org/web/20250502193935/https://www.donaldjtrump.com/agenda47/agenda47-protecting-students-from-the-radical-left-and-marxist-maniacs-infecting-educational-institutions.

[29] *Agenda47: The American Academy* (Nov. 1, 2023), https://web.archive.org/web/20250501043849/https://www.donaldjtrump.com/agenda47/agenda47-the-american-academy.

[30] Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

[31] *Id.*

[32] Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[33] *Id.*

[34] *Id.*

39. Following suit, OMB issued a memorandum requiring all agencies to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for . . . DEI, woke gender ideology, and the green new deal."[35]

40. These directives ultimately led to the termination of billions of dollars in university grant funding at leading research institutions. And at many points during this crusade, President Trump has made his political motivations clear, with cuts primarily targeting blue states and cities, in particular New York. Indeed, New York documented over $1.3 billion in federal cuts to State funding in the first 100 days of the second Trump Administration.[36]

41. The Trump Administration's effort to punish New York has included transportation policy and funding. Just days before wrongfully terminating the SEMPACT grant agreement, for example, Secretary Duffy took aim at New York City's congestion pricing program, threatening the state with "serious consequences" if it did not comply with the Trump Administration's demands.[37]

## IV. DOT's Termination of "Woke University Grants," including Dr. Kamga's

42. On January 29, 2025—less than two weeks after emailing Dr. Kamga about the third installment of grant funds, *supra* ¶ 35—Mr. Singh emailed Dr. Kamga and the other Center Directors to inform them of "a pause in issuing continuation funding for previously-awarded

[35] *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance*, Off. of Mgmt. & Budget (Jan. 27, 2025), https://perma.cc/T2FG-JVK3 (emphasis omitted).
[36] Press Release, N.Y. Governor Kathy Hochul, *100 Days of Turmoil: Governor Hochul Marks Trump's Impacts on New York State* (Apr. 30, 2025), https://perma.cc/QQ8P-8CBB.
[37] Letter from Secretary Duffy to the Honorable Kathy Hochul, Governor of New York (Apr. 21, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-04/Gov.%20Hochul%20Cordon%20Letter_4.21.25_Signed.pdf; Press Release, U.S. Transportation Secretary Sean P. Duffy to Gov. Hochul: Here's What Continuing Your Illegal Toll Could Cost You, U.S. Dep't of Transp. (Apr. 21, 2025), https://www.transportation.gov/briefing-room/us-transportation-secretary-sean-p-duffy-gov-hochul-heres-what-continuing-your.

grants, which directly affects planned obligations to UTC grantees." According to the email, DOT—or at least the office responsible for administering the grant—"continue[d] to hold the UTC Program, and the professors and students who conduct and implement the research, in highest regard." Mr. Singh also praised the "partnerships" between the universities and DOT as "long-standing and fruitful."

43. About two months later, Mr. Singh followed up with Dr. Kamga and the other Center Directors about the pause, explaining that receipt of the "previously competed grants" would now be contingent on compliance with "current Administration priorities and Executive Orders (EOs) that address energy, climate change, diversity and gender, and economic analysis, and other priorities." Notably, this email offered no indication that the grants were subject to termination. Instead, the email instructed the directors to ensure that projects covered by the "next year of funding" aligned with the new Administration's "Executive Orders and Memoranda" and mentioned only the possibility that "the UTC Program office . . . may ask to meet with those of you whose UTC has a major focus on such areas as equity or climate change to discuss possible changes to your grant's statement of work."

44. Mr. Singh again emailed Dr. Kamga and the other Center Directors on April 28, 2025, attaching a letter from Secretary Duffy. This April 24 letter, addressed to "All Recipients of U.S. Department of Transportation Funding," purported to "clarify and reaffirm pertinent legal requirements, to outline the Department's expectations, and to provide a reminder of your responsibilities and the consequences of noncompliance with Federal law and the terms of your financial assistance agreements."[38] According to the letter, "[w]hether or not described in neutral

---

[38] U.S. Dep't. of Transp., Letter to Recipients of U.S. Dep't. of Transp. Funding (Apr. 24, 2025), https://www.transportation.gov/sites/dot.gov/files/2025-04/Follow%20the%20Law%20Letter%20to%20Applicants%204.24.25.pdf.

terms, any policy, program, or activity that is premised on a prohibited classification, including discriminatory policies or practices designed to achieve so-called 'diversity, equity, and inclusion,' or 'DEI,' goals, presumptively violates federal law."[39] This interpretation clearly contradicted many of the elements of the 2022 NOFO. But the letter indicated that it was intended to "provide[] notice" of the legal interpretation set forth therein and recommended "[p]roactive engagement . . . to prevent inadvertent noncompliance."[40]

45. Just four days later, DOT terminated the SEMPACT grant. On May 2, 2025, DOT announced the termination of "seven woke university grants" that purportedly "were used to advance a radical DEI and green agenda that were [sic] both wasteful and ran counter to the transportation priorities of the American people."[41] According to Secretary Duffy, these grants needed to be terminated because they funded, for example, "whether road improvement projects are racist."[42] The SEMPACT grant was terminated because it was, according to the announcement, focused on "equitable transportation for the disadvantaged workforce."[43]

46. That same day, Mr. Singh emailed Dr. Kamga and other stakeholders to inform them that DOT had terminated the SEMPACT grant because "the award no longer effectuate[d] program goals or agency priorities." The termination letter, which was attached to that email and copied Dr. Kamga as the Center Director, attempted to justify the abrupt termination through an unprecedented and expansive interpretation of the provision in OMB's Uniform Grant Guidance that provided for termination "by 'the Federal awarding agency or pass-through entity, to the

---

[39] *Id.*
[40] *Id.*
[41] Press Release, U.S. Transportation Secretary Sean P. Duffy Defunds Woke University Grants (May 2, 2025), https://perma.cc/QT9H-E2N8.
[42] *Id.*
[43] *Id.*

greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities.'" Apparently forgetting that the clause was not specifically incorporated into the grant agreement and incorrectly understanding this clause to bestow them with unfettered authority to disregard or change on a whim the terms of an ongoing contract grounded in statutory requirements, DOT identified its new priorities as, for the first time, "presently includ[ing]":

- promoting traditional forms of energy and natural resources to the greatest extent possible,
- ensuring that taxpayer dollars are used efficiently in ways that maximally benefit the American people and improve their quality of life, and
- ceasing to promote divisive diversity, equity, and inclusion initiatives that discriminate on the basis of race, national origin, or another protected characteristic.

47. The termination letter then identified a handful of phrases from SEMPACT's 2022 application as inconsistent with these priorities:

> CUNY's language "to empower economically disadvantaged populations, including minorities, women, veterans…by improving equity of opportunity in an unequal infrastructure labor market" directly conflicts with agency priorities by targeting specific groups for enhanced opportunity. Likewise, CUNY's "model for Transforming Minority Doctoral Students into Academia …to Increase Diversity of Faculty Across the University" and multiple references to "Equity" ("Our work will address…Equity…," "to promote equity and accessibility," and "equity-based project selection") all prescribe race- or sex-specific initiatives. The SOW's cited work is inconsistent with DOT's priorities.

48. However, DOT's shifting priorities did not provide a valid reason for terminating the SEMPACT grant. Nothing in OMB's Uniform Guidance authorizes DOT to rewrite the UTC Programs' research goals and priorities midstream, let alone to then terminate an existing grant for failing to conform to DOT's newly adopted objectives. Doing so is contrary to a reasonable interpretation of 2 C.F.R. § 200.340, historical practice, and prior agency guidance related to the regulation. In addition, this type of unbound authority is contrary to the structure of the grant program as established by Congress.

49. Moreover, DOT's justifications—through the termination letter and the press release—grossly mischaracterized both SEMPACT's work and the phrases DOT cherrypicked from SEMPACT's application. Specifically, DOT listed five examples of the SEMPACT grant's "cited work" as "inconsistent with DOT's priorities." But multiple of these did not describe the work of SEMPACT at all: one quote actually described the goals of an entirely separate entity that was merely listed in the application as an expected educational collaborator, and another quoted the title of a conference presentation listed on a faculty member's resume submitted as part of the grant application. The three remaining examples were brief references to or uses of the word "Equity." And the DOT's contention that these references somehow "prescribe[d] race- or sex-specific initiatives" is simply false. Two of the instances were references to DOT's own "research priority" of "Equity," which grant applicants were encouraged to include, *supra* ¶ 15. DOT's remaining example—the application's use of the phrase "equity-based project selection"—had nothing to do with how SEMPACT selected research projects or what was required of SEMPACT researchers. Rather, that phrase merely appeared in the description of an "anticipated product" for a single proposed research project: an "[o]ptimization framework" model that would account for costs and benefits such as "improved job access or public health outcomes for neighborhood residents," in addition to traditional metrics such as travel time savings and reduced collision frequencies. Such an optimization framework could eventually be used, presumably by local, state, or federal officials, to evaluate possible Intelligent Transportation System projects. Even if this research were somehow contrary to DOT's current priorities, which it is not, a single project would not justify the wholesale and summary termination of the full grant.

50. SEMPACT unsuccessfully appealed DOT's decision to terminate its federal grant.

## V. DOT's Unlawful Termination of the Grant Harmed Dr. Kamga and SEMPACT

51. As of the date the grant was wrongfully terminated, $5,947,770 of the funds had been approved, and DOT made clear in the grant agreement for the second installment of funds that it "expect[ed] to award three additional increments of funding." These additional increments, totaling roughly $9 million, were, as specified in the agreement, subject only to "availability of funds and to the Grant Recipient's compliance with deliverables due to date," and costs could be incurred under any installment through May 31, 2029.

52. However, as of May 2, 2025, SEMPACT had only used approximately $2.7 million, and SEMPACT had years to request the remaining $3.3 million. As a result of the wrongful grant termination, SEMPACT no longer has access to either these funds or the remaining approximately $9 million scheduled to be distributed over the following three years.

53. Dr. Kamga has suffered immediate harm as a result of this wrongful grant termination. He has had to significantly slow or even halt his own critical research. And as Center Director, Dr. Kamga has had to reallocate considerable time to seeking new sources of funding for SEMPACT, hindering even his non-SEMPACT research. The grant termination has also injured Dr. Kamga's professional reputation as an effective manager of major federal awards. And Dr. Kamga has experienced other monetary damages as a result of reliance on the contract and as a consequence of the breach.

54. Furthermore, valuable data and research has been lost because Dr. Kamga and more than 50 other academics and researchers were unable to complete their planned SEMPACT-funded work. The grant's abrupt termination has also rendered useless the significant investments in equipment, technology, and training made thus far under the SEMPACT grant. SEMPACT's inability to operate has in turn impacted regional and state transportation agencies and the local

communities, who are left without the type of partnership, collaboration, and technical support SEMPACT anticipated providing.

55. As Center Director, the SEMPACT grant supported Dr. Kamga's own salary, as well as that of other faculty, researchers, and staff. Consequently, SEMPACT, through Dr. Kamga, has had to lay off and forego hiring staff, research assistants, fellows, and graduate researchers, as well as find new sources of funding to replace the large and unexpected compensation gap due to loss of the SEMPACT grant. And, to date, Dr. Kamga has been unable to find sufficient alternative funding. Additionally, the SEMPACT grant funded research by doctoral candidates whose dissertations are now stalled and who therefore face expiring funding windows, the loss of competitive fellowships, and delayed entry into the workforce.

56. Moreover, the abrupt termination of the grant and the removal of SEMPACT as the Region 2 UTC jeopardizes other existing and future funding sources. For example, as required by statute and the grant agreement, SEMPACT secured $15 million in matching funds from non-federal sources. Without the federal funds, SEMPACT may not be able to satisfy the requirements of these grants. And without its designation as the Region 2 UTC, SEMPACT may lose the matching funds altogether. The disruption of the SEMPACT grant termination has also impaired the ability of Dr. Kamga and SEMPACT to compete for future grants from federal, state, or private sources by, among other things, reducing staff and researcher capacity.

## CLAIMS

### COUNT I
### Breach of Contract (The SEMPACT Grant)

57. Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

58. To recover for breach of contract, Dr. Kamga must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach

of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

59. To sue under a contract, "the plaintiff must either be a party to the contract or 'stand[] in the shoes of a party within privity' as a third-party beneficiary." *Lea v. United States*, 592 F. App'x 930, 933 (Fed. Cir. 2014) (quoting *Sullivan v. United States*, 625 F.3d 1378, 1379–80 (Fed. Cir. 2010)). "[T]he third party does not need to be specifically identified in the contract"; "third party beneficiary status can . . . be bestowed on those parties that 'fall within a class clearly intended to be benefited' by the contract." *Sullivan*, 625 F.3d at 1380 (quoting *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997)).

60. The SEMPACT grant, as modified on August 15, 2024, is a valid, binding contract entered into by a DOT official with authority to bind the United States.

61. Dr. Kamga is a third-party beneficiary of the contract because the agreement is clearly intended to benefit him, and his involvement was a material term of the parties' agreement. He is explicitly identified as the Center Director. And "[t]he Department's decision to award a UTC Grant to a Recipient is based to a considerable extent upon its evaluation of the proposed Center Director's knowledge of the field of study and his/her capabilities to lead a UTC."[44] The agreement even went so far as to include a future change in the Center Director's involvement or role as a reason to terminate the grant.[45] The agreement also not only contemplated but explicitly defined Dr. Kamga's "meaningful direct involvement in the Center's operations" as the Center Director.[46] And throughout the life of the grant, DOT communicated directly with Dr. Kamga about the implementation—and even the termination of—the grant. As the grant's principal

[44] UTC General Provisions, *supra* note 14, at 9.
[45] *Id.*
[46] *Id.*

investigator, Dr. Kamga was also identified as one of the researchers whose work—including developing models to reduce traffic congestion, assessing the feasibility of an online platform to manage employee shuttles during busy commutes, and investigating barriers to deploying driverless rideshares—would be funded by the grant.

62. As of the date the grant was terminated, DOT had granted $5,947,770 to SEMPACT, with the expectation that the other approximately $9 million would be made available over the following three years.

63. Dr. Kamga complied fully with all the terms and conditions of the SEMPACT grant, and DOT never asserted otherwise.

64. DOT breached the express terms of the agreement by wrongfully terminating the agreement.

65. The grant agreement did not permit DOT to terminate SEMPACT's grant based on a unilateral determination that the award "no longer effectuates the program goals or agency priorities," as DOT did not "clearly and unambiguously" invoke this termination provision in the grant's terms and conditions as required by governing regulations. *See supra* ¶ 26.

66. Setting aside that DOT could not terminate the SEMPACT grant pursuant to this provision, termination was nonetheless improper under 2 C.F.R. § 200.340(a)(4).

67. SEMPACT's contractual obligations are to be understood as those existing at the time of the award. And SEMPACT was both fulfilling these obligations and implementing the precise type of work described in the agreement. Thus, there is no contractual basis for DOT to assert that the program was no longer advancing agency priorities. Nor did DOT give any indication that SEMPACT had otherwise violated the terms of the agreement or failed to satisfy the goals or priorities as established at the time of the award. Instead, DOT arbitrarily terminated

the grant, citing only cherrypicked phrases that purportedly undermined new priorities. *See supra* ¶ 49.

68. DOT's termination of the SEMPACT grant agreement because SEMPACT purportedly "no longer effectuates the program goals or agency priorities" is based on an erroneous interpretation of its authority to terminate the agreement. The agreement does not give DOT the authority to change priorities on a whim after the grant has been awarded. Nor does 2 C.F.R. § 200.340(a)(4) provide it with such unfettered authority. The language of the grant agreement, the text of the regulation, historical practice, and prior agency guidance—as well as requirements imposed by other statutes and the United States Constitution—make clear that termination is only appropriate if the grantee is no longer satisfying the priorities as established at the time the agreement was entered into. Accordingly, DOT is not permitted to simply substitute new priorities into the agreement whenever it wishes and then summarily terminate the agreement for misalignment with these changed priorities.

69. Further, any changed priorities themselves must be permitted by law—which DOT's are not. In fact, DOT's newly asserted priorities—and the grant terminations based on the change in priorities—directly contradict the statute governing the UTC Program. Congress expressly directed the Secretary of Transportation to consider a grant applicant's "demonstrated commitment" to "transportation workforce development" through "outreach activities to new entrants into the transportation field, including women and underrepresented populations." 49 U.S.C. § 5505(b)(4)(B)(v). Yet, DOT used the mere mention of such activities as a reason to terminate the SEMPACT grant. By relying on changed priorities that are contrary to the governing statute, DOT breached the grant agreement.

70. Additionally, because DOT's changed priorities run afoul of 49 U.S.C. § 5505, termination pursuant to 2 C.F.R. § 200.340(a)(4) was not "authorized by law," which constitutes a further breach of the grant agreement.

71. Nor would DOT's improperly retroactive and unlawful priorities justify its termination of the SEMPACT grant. The termination letter made clear that DOT based its termination on snippets of SEMPACT's grant application that do not reflect SEMPACT's actual work. *See supra* ¶ 49. In so doing, DOT ignored the vast majority of the work being done and planned by SEMPACT—work that would undoubtedly advance the priorities of this administration. DOT further failed to consider Dr. Kamga's and SEMPACT's reliance interests, the waste and inefficiency caused by the midstream grant termination, and the substantial public benefits that would have flowed from completion of SEMPACT's work.

72. Moreover, DOT provided no meaningful opportunity for any alleged noncompliance with these changed priorities to be remedied, nor a meaningful opportunity to challenge any finding of noncompliance.

73. Finally, unlawful viewpoint discrimination is not a valid basis for terminating the grant agreement, and DOT may not rely on bare assertions of new agency priorities as a pretext for such discrimination, regardless of whether they have the authority to substitute new agency priorities into the contract.

74. DOT's actions caused Dr. Kamga to suffer damages in an amount to be determined at trial.

**COUNT II**
**Breach of the Duty of Good Faith and Fair Dealing (The SEMPACT Grant)**

75. Dr. Kamga incorporates the above paragraphs as if fully set forth herein.

76. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)).

77. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

78. The SEMPACT grant, as modified on August 15, 2024, is a valid, binding contract entered into by a DOT official with authority to bind the United States.

79. Dr. Kamga is an intended third-party beneficiary of the contract, as explained above.

80. DOT owed an implied duty of good faith and fair dealing to Dr. Kamga as an intended third-party beneficiary.

81. DOT breached this implied duty of good faith and fair dealing. DOT did so by, among other things, targeting the grant for termination on a basis that was not provided for in the contract and preventing the use of money already awarded. These actions were based on an erroneous and bad faith interpretation of 2 C.F.R. § 200.340. Further, as demonstrated by DOT's reliance on a few phrases picked out of the grant agreement's 36-page statement of work, DOT's actions also were clearly premised on a factually erroneous, unreasonable, biased, and partisan opinion of the work being done with the grant funds.

82. DOT's actions interfered with SEMPACT's continued operations as the Region 2 UTC, Dr. Kamga's efforts as Center Director, and any research and projects contemplated by the grant, and they destroyed Dr. Kamga's reasonable expectations regarding the fruits of the SEMPACT grant.

83. Upon information and belief, DOT's termination of the SEMPACT grant was intended to interfere with SEMPACT's continued operations as the Region 2 UTC, Dr. Kamga's efforts as Center Director, and any research and projects contemplated by the grant, despite lacking any authority to do so under the terms of the SEMPACT grant.

84. DOT's actions caused Dr. Kamga to suffer damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

For these reasons, Dr. Kamga respectfully requests that the Court enter judgment in his favor and against the United States in an amount to be determined at trial, as well as any allowable interest, fees, costs, and expenses, and such other relief as the Court deems just and proper.

Dated: June 12, 2026

Respectfully submitted,

*s/Amy E. Powell*

Amy Powell
Kunyu Ching
**Lawyers for Good Government**
319 F St. N.W. Ste 301, PMB 181
Washington, DC 20004
646-246-4633
amy@lawyersforgoodgovernment.org
kunyu@lawyersforgoodgovernment.org

Kathleen Shelton (DC Bar No. 1619066)*
Clayton L. Bailey (DC Bar No. 1644867)*
Margaret (Emmy) Wydman (DC Bar No. 90007646)*
**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
202-505-7920
kshelton@civilservicellp.com
cbailey@civilservicellp.com
ewydman@civilservicellp.com

*Counsel for Plaintiff Dr. Kamga*

**pro hac vice* application forthcoming