# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DR. CAMILLE KAMGA,<br><br>*Plaintiff*,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>*Defendant*. | Case No. 26-870C<br><br>(Chief Judge Matthew H. Solomson) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1
QUESTIONS PRESENTED........................................................................................ 2
BACKGROUND ......................................................................................................... 3
LEGAL STANDARD ................................................................................................. 5
ARGUMENT .............................................................................................................. 7
I. Dr. Kamga Has Standing. ................................................................................. 7
II. Dr. Kamga's Complaint States Claims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing as an Intended Third-Party Beneficiary of the SEMPACT Agreement. ......................................................................................... 8
CONCLUSION ......................................................................................................... 17

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. United States*,
344 F.3d 1343 (Fed. Cir. 2003) ........ 15
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 6
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6
*Carter v. United States*,
102 Fed. Cl. 61 (2011) ........ 9
*Cedars-Sinai Med. Ctr. v. Watkins*,
11 F.3d 1573 (Fed. Cir. 1993) ........ 6
*Christos v. United States*,
48 Fed. Cl. 469 (2000), *aff'd*, 300 F.3d 1381 (Fed. Cir. 2002) ........ 2
*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ........ *passim*
*Cotter Corp., N.S.L. v. United States*,
127 F.4th 1353 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 2678 (2026) ........ 6, 8
*Dimare Fresh, Inc. v. United States*,
808 F.3d 1301 (Fed. Cir. 2015) ........ 3, 10
*F.D.I.C. v. United States*,
342 F.3d 1313 (Fed. Cir. 2003) ........ 15
*Fairholme Funds Inc. v. United States*,
114 Fed. Cl. 718 (2014) ........ 8
*Flexfab, L.L.C. v. United States*,
424 F.3d 1254 (Fed. Cir. 2005) ........ 10
*Glass v. United States*,
258 F.3d 1349 (Fed. Cir.), *opinion amended on reh'g*, 273 F.3d 1072 (Fed. Cir. 2001) ........ 15
*H.F. Allen Orchards v. United States*,
749 F.2d 1571 (Fed. Cir. 1984) ........ 16
*Irwin Cnty. v. United States*,
170 Fed. Cl. 355 (2024) ........ 14
*Knight v. United States*,
65 F. App'x 286 (Fed. Cir. 2003) ........ *passim*
*Montana v. United States,*
124 F.3d 1269 (Fed. Cir. 1997) ........ 9, 10, 11
*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) ........ 8

*Pac. Gas & Elec. Co. v. United States*,
838 F.3d 1341 (Fed. Cir. 2016) .......... 9, 16
*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025) .......... 9
*R&R Conner Aviation, LLC v. United States*,
174 Fed. Cl. 89 (2024) .......... 14
*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) .......... 6
*Sullivan v. United States*,
54 Fed. Cl. 214 (2002) .......... 7
*Thakur v. Trump*,
No. 25-cv-04737 (N.D. Cal. 2025) .......... 12
*UTTO Inc. v. Metrotech Corp.*,
119 F.4th 984 (Fed. Cir. 2024) .......... 6

**Statutes**

49 U.S.C. § 5505(a)(2) .......... 3, 12
49 U.S.C. § 5505(c)(3)(B)(iii)(III) .......... 12
Surface Transportation and Uniform Relocation Assistance Act of 1987,
Pub. L. No. 100-17, § 314 .......... 3

## INTRODUCTION

In 2023, the Department of Transportation (DOT) awarded grant funds totaling $15 million to the Center for Social and Economic Mobility for People And Communities through Transportation (SEMPACT) as part of the latest iteration of the University Transportation Center (UTC) Program. Congress created the UTC Program to fund cutting-edge transportation research by leading academics and researchers around the country. For the next two years, in accordance with the purpose of the statute and the SEMPACT grant agreement, Dr. Kamga, as both SEMPACT's Center Director and a lead researcher, and the other researchers with SEMPACT used their grant funds to research, among other things, bridge collisions involving large ships and overheight vehicles, stormwater flooding in urban areas, artificial intelligence, and autonomous vehicle operations. But on May 2, 2025, DOT unexpectedly and unilaterally terminated the SEMPACT grant agreement as too "woke" and "counter to the transportation priorities of the American people." Dkt. 1 ¶¶ 42–50.

The Government acknowledges that, at the heart of this case, a valid contract exists—the SEMPACT agreement. *See* Dkt. 16 at 10–16; *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("[W]e have followed our predecessor court in treating federal grant agreements as contracts when the standard conditions for a contract are satisfied."). And the Government does not contest that its May 2, 2025 termination of the SEMPACT grant was a breach of contract and a breach of good faith and fair dealing. Instead, the Government argues only that Dr. Kamga cannot bring suit for these breaches, as, in its view, he is neither in privity with the United States nor an intended third-party beneficiary of the SEMPACT agreement.

These arguments from the Government are unavailing. Dr. Kamga's complaint contains express factual allegations that are more than sufficient to plead that he is an intended third-party

beneficiary of the SEMPACT agreement, an established exception to the privity requirement. *See Christos v. United States*, 48 Fed. Cl. 469, 477 (2000) ("Third-party beneficiary status is an exception to the privity requirement that applies in situations where the contract reflects the express or implied intention of the parties to benefit the third-party."), *aff'd*, 300 F.3d 1381 (Fed. Cir. 2002). While the Government downplays or, at times, misconstrues Dr. Kamga's status with respect to the SEMPACT agreement, the SEMPACT agreement explicitly identifies Dr. Kamga as both the Center Director and a researcher. In fact, DOT based the decision to select SEMPACT as the Region 2 UTC on Dr. Kamga serving as Center Director, even reserving the right to modify or terminate the agreement should his level of involvement change. DOT knew Dr. Kamga would receive grant funds to support his work as Center Director and his research. Indeed, the very purpose of the SEMPACT agreement was to fund the work of Dr. Kamga and the other SEMPACT researchers. The language and structure of the SEMPACT agreement, as well as the statute governing the UTC program, make this purpose clear.

For these reasons, Dr. Kamga has established that he is an intended third-party beneficiary of the SEMPACT agreement, and the Government's motion should be denied.

**QUESTIONS PRESENTED**

1. Does Dr. Kamga's complaint set forth non-frivolous allegations that he is an intended beneficiary of the SEMPACT agreement such that the Court possesses subject matter jurisdiction to consider his claims for breach of contract and breach of the duty of good faith and fair dealing?
2. Does Dr. Kamga's complaint contain factual allegations that are sufficient to state plausible claims for breach of contract and breach of the duty of good faith and fair dealing as an intended third-party beneficiary?

## BACKGROUND

Congress created the UTC Program in 1988. Dkt. 1 ¶ 9 (citing Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 314, 101 Stat. 132, 230–32). The central purpose of the UTC Program, as clarified by Congress over the years, is to enable cutting-edge transportation research and develop the nation's leading transportation experts. Dkt. 1 ¶¶ 10–11; *see* 49 U.S.C. § 5505(a)(2). Through multiple reauthorizations, Congress has continued to distribute funds to achieve these goals through UTCs across the country. Dkt. 1 ¶¶ 10–11.

The latest iteration of funding for the UTC Program was announced in May 2022. *Id.* ¶ 13. SEMPACT applied to serve as the regional UTC for Region 2, which covers New Jersey, New York, Puerto Rico, and the U.S. Virgin Islands. *Id.* ¶ 16. As a result of this application, SEMPACT was designated as the Region 2 UTC and awarded a grant totaling $15 million to be disbursed in annual increments over the following five years. *Id.* ¶ 18.

The SEMPACT grant agreement incorporated: (i) SEMPACT's application; (ii) Grant Deliverables and Reporting Requirements for 2023 University Transportation Centers, dated June 2023; and (iii) General Provisions of Grants for 2023 University Transportation Centers, dated June 2023. *Id.* ¶ 20.[1] The agreement identified Dr. Kamga as the Center Director and a lead researcher. *Id.* ¶¶ 17, 61. In this role, and as stated in the SEMPACT agreement, Dr. Kamga was expected to oversee SEMPACT's work and ensure compliance with UTC Program requirements;

[1] The SEMPACT agreement, which itself incorporated the application, Grant Deliverables and Reporting Requirements for 2023 University Transportation Centers, and General Provisions of Grants for 2023 University Transportation Centers, Dkt. 1 ¶ 20, was incorporated by reference into the complaint. *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) ("We may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" (citation omitted)).

he had "overall Center responsibility, including the conduct of all programs, development of new initiatives and public presentation of SEMPACT business and accomplishments," and would "serve as liaison with USDOT, sponsors and other groups." *Id.* ¶ 17. The agreement also specified additional expectations and requirements for Dr. Kamga, as Center Director, defining his "meaningful direct involvement" to include, among other things:

- In-person attendance at all UTC Program related meetings, symposiums and conferences.
- Keeping the Grant Manager and the UTC Program Director abreast of new/evolving developments at the Center.
- Responding to Program enquiries in a timely manner as specified by the UTC Program Director.
- Adopting and follow prescribed Program protocols in normal Center operations.
- Conducting frequent progress meeting with Consortia member teams.
- Ensuring on time submission of grant deliverables and reporting requirements.[2]

Moreover, the SEMPACT agreement also made clear the material importance of Dr. Kamga to the award of funds. Specifically, in addressing a future change in Center Director, the SEMPACT agreement emphasized that DOT's "decision to award a UTC Grant . . . is based to a considerable extent upon its evaluation of the proposed Center Director's knowledge of the field of study and his/her capabilities to lead a UTC." UTC General Provisions, *supra* note 2, at 9. Replacing the Center Director, even temporarily, required prior written approval from DOT, and a change in Dr. Kamga's involvement could result in the modification or termination of the agreement. *Id.*

As soon as the grant was awarded in 2023, Dr. Kamga and the other SEMPACT researchers began conducting the research and programs contemplated by the agreement. Dkt. 1 ¶ 28. This research included efforts to modernize risk assessments used to protect bridge piers from large

[2] U.S. Dep't of Transp., Univ. Transp. Ctrs. Program: General Provisions of Grants 9 (June 2023), https://www.transportation.gov/sites/dot.gov/files/2023-06/UTC%20General%20Provisions%20of%20Grants%20FINAL%20June%202023.pdf (incorporated into the SEMPACT agreement).

ship impacts, evaluate alternative technologies to protect bridges from overheight vehicle collisions, develop models to better predict urban stormwater flooding, and establish a roadmap for small- and medium-sized transit agencies to use artificial intelligence for, among other things, autonomous vehicle operations. *Id.* ¶¶ 28–30. And Dr. Kamga worked diligently as Center Director to ensure that his obligations were satisfied and that SEMPACT operations complied with the SEMPACT agreement. *Id.* ¶¶ 28–35. Accordingly, DOT began disbursing grant funds pursuant to the SEMPACT agreement. *Id.* ¶¶ 34–35. But on May 2, 2025, DOT unexpectedly and unilaterally terminated the SEMPACT agreement. *Id.* ¶ 45.

Dr. Kamga filed this complaint in his third-party beneficiary status on June 12, 2026, asserting two claims. *See generally id.* Count I alleges that DOT breached the SEMPACT agreement—a valid, binding contract entered into by a DOT official with authority to bind the United States—by wrongfully terminating the agreement. *Id.* ¶¶ 57–74. In Count II, Dr. Kamga contends that DOT also breached its duty of good faith and fair dealing by, among other things: targeting the grant for termination on a basis that was not provided for in the contract and preventing the use of money already awarded; interfering with SEMPACT operations, Dr. Kamga's work, and any research and projects contemplated by the agreement; and destroying Dr. Kamga's reasonable expectations regarding the fruits of the SEMPACT grant. *Id.* ¶¶ 75–84.

**LEGAL STANDARD**

A complaint survives a motion to dismiss for lack of subject-matter jurisdiction under RCFC 12(b)(1) as long as the plaintiff has "set forth a non-frivolous allegation of a breach of a contract with the government." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1341 (Fed. Cir. 2021). This "low standard" applies even in cases involving challenged claims by third-party beneficiaries, and the plaintiff must show only that "its allegation that it is among the class of

intended beneficiaries . . . is not frivolous." *Cotter Corp., N.S.L. v. United States*, 127 F.4th 1353, 1373 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 2678 (2026).[3] "If a Rule 12(b)(1) motion simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993).

A complaint defeats a motion to dismiss under RCFC 12(b)(6) if the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The standard requires "more than a sheer possibility that a defendant has acted unlawfully" but "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Put another way, the question is "whether the factual allegations of the complaint are not merely consistent with but cross the line to support a plausible inference of liability under the invoked legal standard." *UTTO Inc. v. Metrotech Corp.*, 119 F.4th 984, 992 (Fed. Cir. 2024). In reviewing RCFC 12(b)(6) challenges, this Court "accept[s] all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of [the plaintiff]." *Cotter*, 127 F.4th at 1366.

---

[3] The Government takes a confused approach to its RCFC 12(b)(1) challenge, claiming that Dr. Kamga "bears the burden of proving, by a preponderance of the evidence, that the Court possesses subject-matter jurisdiction." Dkt. 16 at 7–8 (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). This heightened standard, however, only applies to RCFC 12(b)(1) challenges to the truth—rather than the sufficiency—of the facts alleged. *See Reynolds*, 846 F.2d at 748–49 (applying preponderance standard "to determine if Reynolds in fact served under contract"). As the Government appears to only raise a facial claim, *see, e.g.*, Dkt. 16 at 7 (citing the standard from *Cedars-Sinai* for facial claims), the lower standard governs.

## ARGUMENT

### I. Dr. Kamga Has Standing.

The Government claims that this Court lacks jurisdiction over Dr. Kamga's complaint because he does not have standing to sue the United States. Dkt. 16 at 9. But this claim is wrong. As the Government itself admits in its motion, intended third-party beneficiaries have standing to bring suit against the Government in this Court. *Id.* at 9 n.5. "[I]n order to overcome the government's motion to dismiss under Rule 12(b)(1), [a plaintiff is] merely required to set forth a non-frivolous allegation of breach of a contract with the government." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1341 (Fed. Cir. 2021). The United States, therefore, "has a high standard to meet in persuading the court to dismiss a claim" on standing grounds. *Sullivan v. United States*, 54 Fed. Cl. 214, 216 (2002).

The Government has not met this burden, as Dr. Kamga's complaint clearly sets forth non-frivolous allegations of a breach of a contract with the Government for which he is entitled to bring suit. *See* Dkt. 1 ¶¶ 59–61. Dr. Kamga alleged in no uncertain terms that he "is a third-party beneficiary of the contract because the agreement is clearly intended to benefit him, and his involvement was a material term of the parties' agreement," and supported these allegations with the terms of the agreement. *Id.* ¶ 61. While the Government disagrees that these facts are sufficient to establish intended third-party beneficiary status, the Government does not—and cannot—argue that these claims are frivolous. Indeed, in a separate case involving an identical grant to a different UTC, the government admitted that Center Directors and professors like Dr. Kamga "have a non-frivolous claim to third-party beneficiary status." Defs.' Supp. Br. at 9, *Thakur v. Trump*, No. 25-cv-04737 (N.D. Cal. Sep. 5, 2025), Dkt. No. 122. Moreover, in *Knight v. United States*, the Federal Circuit reasoned that a group of employees had third-party beneficiary standing based on a federal grant agreement between their employer and the United States that contemplated their ongoing

employment. 65 F. App'x 286, 290 (Fed. Cir. 2003). Indeed, this was sufficient for standing even though the agreement only generally referenced "qualified employees" and even though the employees had not proven that they were, in fact, "qualified." *Id.* Taken as true, as they must be at this stage, Dr. Kamga's allegations are not frivolous and more than clear this "low standard." *Cotter Corp., N.S.L. v. United States*, 127 F.4th 1353, 1373 (Fed. Cir. 2025) (accepting plaintiff's "allegation that it is among the class of intended beneficiaries of the contractual provision promising indemnity"), *cert. denied*, 146 S. Ct. 2678 (2026).

Thus, Dr. Kamga has standing to pursue his claims in the Court of Federal Claims, and the Government's RCFC 12(b)(1) motion to dismiss should be denied.[4] To the extent the Government claims that Dr. Kamga has not plausibly alleged facts to establish his third-party beneficiary status, that question is one to be resolved on the merits under the RCFC 12(b)(6) standard. *Columbus*, 990 F.3d at 1341–42; *Cotter*, 127 F.4th at 1372–73. And, as detailed below, Dr. Kamga's complaint survives such a challenge.

## II. Dr. Kamga's Complaint States Claims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing as an Intended Third-Party Beneficiary of the SEMPACT Agreement.

The SEMPACT agreement was clearly intended to benefit Dr. Kamga. *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1345 (Fed. Cir. 2021) ("The test for third-party beneficiary status is whether the contract reflects the intent of the contracting parties to benefit a third party. The intended benefit must be direct."). The intent to benefit Dr. Kamga is reflected in the contents of the agreement and the purpose of the statute pursuant to which the grant was made. The

[4] In the alternative, the Court should allow for discovery into the "jurisdictional fact[s] alleged in a complaint." *Fairholme Funds Inc. v. United States*, 114 Fed. Cl. 718, 720–21 (2014) (citation omitted); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues.").

Government's arguments to the contrary rely on caselaw that is inapt and principles that have been overturned.

As an initial matter, the Government implies that Dr. Kamga must show that he has a "direct right to compensation[,] or the power to enforce that right against the promisor." Dkt. 16 at 11 (citation omitted). But that is simply not the applicable standard in this Circuit for cases like Dr. Kamga's. In *Montana v. United States*, the Federal Circuit explicitly ruled that this particular requirement applies only to a discrete subset of claims, 124 F.3d 1269, 1273 (Fed. Cir. 1997)—namely, when "members of the public bring suit against promisors who contract with the government to render a public service," *id.* at 1273 n.6. *See also Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1361 (Fed. Cir. 2016) (explaining that "a third-party beneficiary need not always be named explicitly in the contract, have the direct right to compensation, or the power to enforce that right against the promisor" (cleaned up)). Because Dr. Kamga does not bring this suit as a general member of the public, he need not have a "direct right to compensation or to enforce that right against the promisor." *Montana*, 124 F.3d at 1273.

The SEMPACT agreement plainly establishes that Dr. Kamga was part of "a class clearly intended to be benefited." *Id.* The very purpose of the SEMPACT agreement was to fund the work and research described in the application. That application, which was incorporated into the agreement, *supra* note 1, identified Dr. Kamga as the Center Director and detailed his research, Dkt. 1 ¶¶ 2, 16–17. The grant recipient named on the face of the SEMPACT agreement, the Research Foundation of City University of New York—City College, serves as a conduit through which UTC funds flowed to those who "actually use and benefit from" the grants. *Carter v. United States*, 102 Fed. Cl. 61, 70 (2011); *see* Dkt. 1 ¶ 2 and n.1; *cf. President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 110–11 (D. Mass. 2025) ("Although

the Court recognizes that Defendants' actions ultimately impact grant agreements that are awarded, in name, to the 'President and Fellows of Harvard College,' . . . the notion that the resultant harm to professors and graduate students is at best speculative or attenuated is divorced from the reality of how federal research grants function."). In fact, the Center Director's salary was included as a separate line item in the "Center Budget Plan" that SEMPACT was required to submit. U.S. Dep't of Transp., Notice of Funding Opportunity for the Univ. Transp. Ctrs. Program (NOFO) 40[5]; *see* Dkt. 1 ¶ 55. Given these facts, Dr. Kamga "would be reasonable in relying on the [agreement] as manifesting an intention to confer a right on him." *Montana*, 124 F.3d at 1273.

DOT certainly understood that the grant was funding Dr. Kamga as both SEMPACT's Center Director and an individual researcher therein. *Cf. Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005) (finding relevant to intended third-party beneficiary status that "the contracting officer . . . be put on notice, by either the contract language or the attendant circumstances, of the relationship between the prime contractor and the third-party subcontractor so that an intent to benefit the third party is fairly attributable to the contracting officer."). In Dr. Kamga's case, the NOFO required detailed information about him as the proposed Center Director. NOFO 31. And his identity as Center Director was so important to the agreement that it was "based to a considerable extent" upon his individual "knowledge of the field of study and [his] capabilities to lead a UTC." Dkt. 1 ¶ 21. Accordingly, the agreement required notice of any change in his contributions to SEMPACT or a change in his status as Center Director, and DOT specifically reserved the right to "begin termination procedures" if such a change was not approved. *Id.* ¶ 20;

[5] The NOFO was incorporated by reference into the complaint. *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) ("We may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." (cleaned up)).

UTC General Provisions, *supra* note 2, at 9; *see also* Dkt. 16 at 6. Such terms would not have been included if Dr. Kamga's participation were as immaterial as the Government seeks to portray.

The Government attempts to make much out of its claims that Dr. Kamga is not identified explicitly as the grant recipient, Dkt. 16 at 10, that his research is "not called out in particular as a purpose of the grant agreement," *id.* at 13, and that portions of the agreement refer only to the "Center Director" and not Dr. Kamga by name, *id.* at 14. But the Federal Circuit has been clear that "the intended beneficiary need not be specifically or individually identified in the contract." *Montana,* 124 F.3d at 1273. Moreover, as explained above, the SEMPACT agreement incorporated the grant application which expressly mentioned both Dr. Kamga's role as Center Director and his research, and DOT unambiguously knew that Dr. Kamga was the Center Director given the application and their ongoing and direct communications about the grant. *See, e.g.*, Dkt. 1 ¶¶ 17, 22, 35, 42–44, 46. That DOT chose to incorporate generalized provisions into each UTC grant agreement rather than prepare separate agreements for each UTC that reflected the names of the individual Center Directors does not change these facts.

More generally, the statutory purpose of UTC funding also reflects an intent to benefit Dr. Kamga. "For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Columbus*, 990 F.3d at 1345 (citation omitted). Congress outlined clear purposes for UTC grants like SEMPACT's:

> (A) to advance transportation expertise and technology in the varied disciplines that comprise the field of transportation through education, research, and technology transfer activities;
>
> (B) to provide for a critical multimodal transportation knowledge base outside of the Department of Transportation; and

> (C) to address critical workforce needs and educate the next generation of transportation leaders with respect to the matters described in subparagraphs (A) through (G) of section 6503(c)(1).

49 U.S.C. § 5505(a)(2). While the statute broadly provides for grants to go to university consortiums, the statutorily defined purposes of those grants clearly contemplate that the funds are to benefit the class of individual researchers who comprise the consortium—the class of individual researchers who will be doing the work. It is the individual researchers who possess and will further develop the "transportation expertise" referenced in the first purpose listed above. It is the individual researchers who will serve as the "knowledge base outside of the Department of Transportation" described in the second purpose. And it is the individual researchers who will "educate the next generation of transportation leaders." Indeed, the statutory grant-selection criteria include "an experienced faculty who specialize in professional fields closely related to highways and public transportation." *Id.* § 5505(c)(3)(B)(iii)(III). These purposes are not undermined by or somehow inconsistent with the fact that the "grant agreements fund research for the benefit of the general public." Dkt. 16 at 14 (citing *Thakur v. Trump*, 800 F. Supp. 3d 1044, 1064 (N.D. Cal. 2025)).[6] Certainly, all parties involved, including Dr. Kamga and the SEMPACT researchers, seek to benefit the public with their work. But "that does not mean it is the only purpose of every numbered paragraph of the contract." *Knight v. United States*, 65 F. App'x 286,

[6] The Government's reliance on the district court decision in *Thakur* is misplaced. It is an out-of-circuit district court decision that evaluated substantively different claims brought under the Administrative Procedure Act without directly analyzing the provisions of the UTC agreement at issue. The appeal of that decision (which covers DOT) is held in abeyance pending resolution of the government's appeal of the grant of preliminary injunction against other agencies. Dkt. No. 2, No. 25-7342. Defendants' petition for certiorari regarding the preliminary injunction against those other agencies was denied today. *See* Docket Text, *Trump v. Thakur*, No. 26-210 (Nov. 16, 2026). The Government's argument based on *Thakur* is also inconsistent with the Federal Circuit's reasoning in *Columbus*, and the Court should decline the Government's invitation to err.

290–91 (Fed. Cir. 2003); *see also Columbus*, 990 F.3d at 1345 (explaining that contracts can benefit multiple distinct groups).

The Government attempts to equate Dr. Kamga's role within SEMPACT to that of one of many known or unknown subcontractors working for a prime contractor, minimizing these experts as simply "various researchers" and claiming that they are "merely individuals engaged to complete work to advance the center's purpose." Dkt. 16 at 13. But this dismissive characterization misses the point of the SEMPACT agreement, ignores the grant funds' congressionally mandated purpose, and runs contrary to precedent. In *Columbus*, the Federal Circuit found that the plaintiff was an intended third-party beneficiary of a federal grant provided to the state of Indiana for disaster assistance even though the plaintiff did not receive the grant funds directly and was not mentioned in the grant agreement. *Columbus*, 990 F.3d at 1345–48. The *Columbus* court reasoned that the purpose of the grant funds and the agreement was to support disaster assistance relief and that the plaintiff was "clearly" the type of entity that was intended to benefit from the funds because the plaintiff would provide the type of assistance—do the type of work—the grant was meant to support. *Id.* at 1346. In so doing, the Federal Circuit dismissed the government's concern that, in so holding, "any entity . . . that might benefit in any way from the disaster-recovery assistance would be a third-party beneficiary, thus stretching that doctrine beyond its breaking point," because FEMA had to approve requests from potential recipients of the funds before the funds were distributed. *Id.*

So too in the case of Dr. Kamga and the SEMPACT agreement. As explained above—and as the Government agrees—the purpose of the SEMPACT agreement is to fund the research contemplated by the statute and set forth in the agreement. *See* Dkt. 16 at 2–3, 14. Dr. Kamga is unquestionably the type of researcher who can, did, and hopes to continue to conduct the research

the grant is intended to enable. The Government's reliance on *R&R Conner Aviation, LLC v. United States* disregards that court's recognition of this very type of third-party beneficiary. 174 Fed. Cl. 89, 96–97 (2024) (summarizing circumstances in which third parties who were meant to use and benefit from what was promised are intended third-party beneficiaries). Contrary to the Government's assertion that the grant funds were provided to fund research "regardless of who is performing that research," Dkt. 16 at 13, DOT selected SEMPACT precisely because of the unique expertise and experience of Dr. Kamga. And Dr. Kamga does not seek third-party beneficiary status based only on DOT's knowledge and consideration of his "experience and capabilities," which was only found insufficient "without more." *Irwin Cnty. v. United States*, 170 Fed. Cl. 355, 363 (2024). Rather, it is DOT's knowledge and consideration of Dr. Kamga's experience and capabilities *combined with* the many other indications described herein that establish DOT's intent to benefit Dr. Kamga here, including: Dr. Kamga serving as Center Director was material to the SEMPACT agreement, *see supra* at 3–4; the agreement specifically contemplated his salary as Center Director, *see supra* at 10; DOT had ongoing and direct dealings with Dr. Kamga, *see supra* at 11; and DOT explicitly required notice of any change in Center Director and had to approve even temporary replacements, *supra* at 10. Furthermore, whether he is in a class of one as Center Director or a small class of approved UTC researchers, the SEMPACT agreement makes clear that, as in *Columbus*, "the class of potential third-party beneficiaries of the . . . contract [i]s not unbounded." 990 F.3d at 1346. DOT set strict parameters around who can serve as the single Center Director, including requiring that person to be from the lead grantee institution as opposed to one of the consortium members. *See* NOFO 29. And DOT requires that individual research projects and budgets be approved before any grant funds are disbursed for that research. *See* UTC General Provisions, *supra* note 2, at 11–12.

The other situations the Government attempts to analogize to Dr. Kamga are similarly inapposite. For example, Dr. Kamga—the sole SEMPACT Center Director and a key researcher therein—is a far cry from a mere shareholder whose investment lost value. The Government cites to multiple of the over 120 "*Winstar*" cases in which shareholders of certain financial institutions sued the federal government, alleging that they had previously invested in such financial institutions based on their use of a specific accounting method that was later barred by federal law. *See* Dkt. 16 at 14–15 (analyzing *Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003)[7]); *see also Glass v. United States*, 258 F.3d 1349 (Fed. Cir.), *opinion amended on reh'g*, 273 F.3d 1072 (Fed. Cir. 2001); *F.D.I.C. v. United States*, 342 F.3d 1313 (Fed. Cir. 2003). Specifically, when the financial institutions in which plaintiffs had invested began failing as a result of the change in regulations, the plaintiffs sued the federal government to recover the investments, "contend[ing] that [the enactment of the federal law barring this accounting method] breached [the institution's] contract with the government," as that contract previously allowed the financial institution to use said accounting method, which would, in turn, have financially benefited the shareholders in those institutions. *Glass*, 258 F.3d at 1350–52. Understandably, courts repeatedly found this an attempt to stretch the third-party beneficiary doctrine beyond its reasonable limits, as "every promise the government allegedly failed to keep in the wake of [the change in law] pertains to the regulatory treatment of [the financial institutions]," not the investments of any number of unknown shareholders. *Anderson*, 344 F.3d at 1351–52; *see also F.D.I.C.*, 342 F.3d at 1320; *Glass*, 258 F.3d at 1354–55. But the circumstances in these cases are nothing like the instant matter.

---

[7] The plaintiffs in *Anderson* were two sons who were identified as beneficiaries of a trust that owned or controlled shares of the type of financial institution at issue in these cases, but the court in *Anderson* analyzed their claims as those of shareholders more generally, applying the same reasoning as that used in cases involving direct shareholders. 344 F.3d at 1351–52.

Nor, given his unique position, is Dr. Kamga akin to one "of the many participants on the buy-side of the California wholesale energy market" that the Government points to as having unsuccessfully sought to recover from the federal government because they only had a contractual remedy against the energy exchanges themselves and were not explicitly identified in the contract. *Pac. Gas*, 838 F.3d at 1362. The court's decision in *Pacific Gas*, though, was based on the diffuse and indeterminate nature of potential beneficiaries: "[I]t is impossible to trace the transfer of electric power from producers to consumers. Appellants cannot demonstrate any particular benefit flowing to them from the government agencies, let alone that the exchanges' contracts with the government intended to benefit them specifically, independent of all other market participants." *Id.* Not so as to Dr. Kamga. As discussed at length *supra*, DOT entered into the SEMPACT agreement precisely because SEMPACT was specifically comprised of Dr. Kamga and the other researchers such that these individuals, as opposed to the grant signatory, would receive the benefit of the agreement. *See H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed. Cir. 1984) (allowing suit by farmers where the "irrigation districts," the contracting parties, did not use the contract benefit themselves, but rather "act[ed] as a surrogate for the aggregation of farmers"). Indeed, multiple provisions of the SEMPACT agreement, including the incorporated application that explicitly identified Dr. Kamga and detailed the research to be completed, "indicate that there was careful deliberation on to whom this benefit should run," and that the result of this deliberation was to convey benefits to Dr. Kamga. *Knight*, 65 F. App'x at 291; *see id.* ("The contract provision warranting future employment by its own terms applies specifically to 'LNC staff' and no one else.").

For these reasons, Dr. Kamga sufficiently pleaded that he was an intended third-party beneficiary of the SEMPACT agreement.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's motion to dismiss in full. Plaintiff respectfully requests oral argument. In the alternative, if the Court grants the Government's motion, Dr. Kamga respectfully requests that it be granted without prejudice such that Dr. Kamga can seek leave to amend his complaint.

Dated: November 16, 2026

Respectfully submitted,

*/s/ Amy Powell*

Amy Powell
Kunyu Ching
**Lawyers for Good Government**
319 F St. N.W. Ste 301, PMB 181
Washington, DC 20004
646-246-4633
amy@lawyersforgoodgovernment.org
kunyu@lawyersforgoodgovernment.org

Kathleen Shelton (DC Bar No. 1619066)*
Margaret (Emmy) Wydman (DC Bar No. 90007646)*
**Civil Service Law Center LLP**
1455 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
202-505-7920
kshelton@civilservicellp.com
ewydman@civilservicellp.com

*Counsel for Plaintiff Dr. Kamga*

* Admitted *pro hac vice*